Good morning, this is Donovan, this is Wells. We're here today on a case that was tried almost a year ago in September of last year. This is a case that was two parties bringing a lawsuit against the Union Pacific Railroad. The claim of Guy Webb was a claim for personal injuries as a result of the accident. The claim of James Webb was a wrongful death claim. This case was tried in Madison County in front of Judge Matosian and resulting in verdicts on behalf of both of the plaintiffs. And from these verdicts is what we're appealing from. First of all, I think this is kind of a rare type of case from the cases you typically see. In fact, it's a rare type of case from one that I typically try. And the reason being, usually when you're trying a case that there might be dispute regarding what happened. We don't have a dispute as to what happened in this case. And the reason being, and it's part of the record, in fact it was offered as evidence by the plaintiff in this case, we actually have a video recording of what transpired in this accident. And what that video recording reflects is on the date back on August 23, 2007. By the way, this happened in Iron County, Missouri. Mr. Guy Webb and James Webb, they were staying at this campground that Guy and his wife had purchased a few years before that. And this is on private property. This is a, and it's undisputed, this is a private railroad break crossing. It is not a public railroad break crossing. And the Webb's were very familiar with this crossing. And this crossing was equipped with stop signs on both sides of the crossing, which indicated that stop, but also indicated that this was a private crossing. Mr. Webb himself, Guy Webb, doesn't own this particular property. He owns property on the other side. But when he purchased the property with his wife, in order to access that property, they had to get an easement from the actual property owner who owns the property that leads, there's actually a dirt, very rough dirt road that leads off a local highway. From, past the owner's house, the owner of this property. And this road winds around, goes over the crossing, and when you get on the other side of the crossing, a little ways past there, about a quarter of a mile from the main road, is where Mr. and Mrs. Webb had their campground. So, what we know of is that they were both very familiar with this crossing and never experienced any problems whatsoever in traversing that crossing. On any other occasion, they used it. And they indicated, both of them, indicated that they used this crossing very infrequently. They actually live in Madison County. And they used this, purchased this as basically a campground to periodically go down to use. So this, this wasn't their main home. This was, again, used as a campground for them to use for recreational purposes. I think it said in the record, and maybe, not the record, I'm sorry, in one of the briefs, this is the first time they ever saw a train at that crossing? I believe they said it was the first time they actually ever saw a train at the crossing. I think they indicated they heard trains going through. In fact, Mrs. Webb testified she could hear the rumble of the trains from a quarter of a mile as the trains approached the crossing. Also, the train crew themselves indicated in their entire career of passing through this, they had never seen any vehicles previously at this crossing. So, it's uncontradictory evidence that this is a very rarely used private crossing. So, what does the video show? The video shows that the train is approaching this crossing. And the, as the video camera, which is mounted on the front of the locomotive, and I don't know if your honors have had a chance to see that, but it's in the record, and I welcome you to look at that video. But what it shows is that the vehicle, the pickup truck that Mr. Guy Webb is driving, drives past the stop sign, and he brings his vehicle out to a stop where basically the front wheels are basically on the first rail of the crossing. Of course, everybody knows that's not where you stop a vehicle when you approach a railroad grade crossing. What the video then shows is that after a few seconds, you see the front wheels roll back off just a short distance. Then you see the spinning wheels of the back wheels of the pickup truck. You can actually see the dust from the back wheels where he's obviously making some major acceleration. He then goes forward again, and this time he moves where his front wheels are actually in between the rails, and he stops again. And the collision ensues. Now, that's in some instances what the facts are as far as what transpired in the accident. One thing that's never been disputed, that from the time that this pickup truck becomes within the view of the train crew, the train crew had no ability to stop that train to avoid a collision. Undisputed. So, what was this case? This is a case, and I have to use a euphemism, but this is a case where the defendant was bound, gagged, and had their hands tied behind their back, and we were not allowed to present our case. Now, this is the case that was allowed to be tried. We had Judge Matosian not interpreting law. We had Judge Matosian rewriting the law. The regulations throughout this case, the plaintiff and their expert witnesses referred to regulations regarding the sounding of horn at the crossing,  and regulations regarding, as you approach this crossing, that have absolutely nothing to do with a private crossing. In fact, the regulations, each and every one of them, specifically indicated those regulations apply to public crossings. So, first of all, Judge Matosian reaches this conclusion, a crossing is a crossing. It doesn't make any difference whether this is a private crossing. So, Judge Matosian allows the plaintiff's attorneys to refer to these regulations, talk about the regulations, and use it as a basis for their expert witnesses to criticize Union Pacific Railroad, saying that they did all these things wrong in violation of these regulations. But he wouldn't even allow the defendant to put into evidence the regulations, to show the jury the regulations, to show the jury that the regulations specifically refer to regulations on public crossings and not private crossings. There is some kind of offer of proof of what these other regulations are. Absolutely. And they're in the record. This was very difficult. We had to make offers of proof of everything. We made offers of proof on all of these things. As a matter of fact, you will see in the record, at one point, when the judge is allowing the plaintiff to use one of these regulations with his expert, we're making an offer of proof, we're discussing that with the judge, and the judge tells him, okay, well, I'll allow you to refer to these regulations, which were, by the way, the expert's own files, the complete regulations at table, but I'll allow you to cross-examine. So when I got to my cross-examination and I started asking the expert, based upon the ruling that the court had given me that morning, he reversed himself. He says, no, no, we don't have to go under these regulations. I'm not allowing these regulations to be used. So, in this case, we have a situation that the plaintiff presented a case on the basis of regulations and violations of regulations by Union Pacific Railroad that the law is clear had no application to this particular process. And, of course, that's one of the reasons why not only did we make a motion for direct verdict at the close of Plaintiff's case and at the close of all the evidence, we filed a motion for judgment notwithstanding the verdict. Because, quite frankly, Your Honors, when you look at the video and you see what transpired in this accident, Plaintiff did not make a submissible case of proof of any violation to support a negligence claim against Union Pacific Railroad, with the exception of these distortions of what these regulations that didn't apply, didn't apply according to justification. And if you look at the entire record, if you look at the entire evidence, there's absolutely nothing to support a verdict for the plaintiff absent. You take out these regulations that don't apply, there's nothing in this record that will support a verdict for the plaintiff. And that's the reason why, first of all, we ask for a judgment notwithstanding the verdict. Excuse me, were there any special interrogatories submitted to the jury to indicate why they ruled in favor of the plaintiff and against the defendant? No, Your Honor. And, of course, because we couldn't phrase any special interrogatories because of the court's ruling that crossing is a crossing, we couldn't even phrase interrogatories to the special interrogatories trying to make that distinction because we were prohibited from doing it. As a matter of fact, as you will see in the record, when the plaintiff actually put some of our railroad people on in their case and they proceeded to ask them questions about regulations and some of these same regulations, and when the witnesses attempted to testify, but that regulation doesn't apply, the judge cuts them off and says, you can't talk about it. So, I mean, this is just a compounding of error after error, but not only because, first of all, it comes in as a regulation that applies to private crossing, but virtue of the fact that we couldn't even respond and explain this to the jury why their Union Pacific Railroad didn't do the things that were claimed in this case. As a matter of fact, as far as they form, the federal government in the year 2006 actually passed a new regulation, and I know you probably have had railroad crossing cases before and you're familiar with what's called a whistle post. Years ago, all railroad crossings, public railroad crossings in the states would have a whistle post, which is basically placed about a quarter of a mile before a crossing. And, of course, trains, different types of trains that travel at different types of speeds would begin to blow their whistle at whistle posts. There was a concern about noise pollution, and so in 2006 the federal government said, okay, this is what we're going to do. We're going to allow municipalities to actually prohibit the sounding of whistles at crossings, and it's all done by regulation. But if a crossing is to be sounded at a crossing, it is to be blown 15 seconds, but no more than 20 seconds. And the reason why that changed the whole thing, as you can imagine, you have a train that you've got the sign, the whistle post is a quarter of a mile from the crossing. If you have a train that's going 60 miles an hour, it's going to give approximately 20 seconds of warning. If the train has a speed to 30 miles an hour, it's going to give 40 seconds of warning. And there's no reason to have that, and that's the reason why that regulation was changed. But the plaintiff and their experts talk about the fact that this group, the railroad didn't put up a whistle post at this crossing, and that they didn't sound their whistle for this time frame. So again, and the regulations, which again, we've provided you, they're cited in the brief, clearly show that these regulations, and they specifically say these regulations apply to public crossings. They do not apply to private crossings. And as a state stepping in, they do clarify that a state could step in and make regulations of a private crossing, but in this case, the state of Missouri never did that. In fact, the state of Missouri actually has their own regulation on the sounding of whistle, independent of federal law, and then again, that regulation, which was referred to in the record, deals with public crossings. Were there any regulations for, say, grain and makeup on the crossing on a private crossing? No. And quite frankly, the problem with that as far as these private crossings, why they don't have those types of regulations is because of the fact that a lot of these are just farm crossings there, and there's, you'd probably be surprised at how many number of, there's private crossings there are, and we don't, the railroad doesn't control the roadway, doesn't control what type of roadway these people decide to put on their private property to access the crossing, and basically, these crossings aren't for the benefit of Union Pacific Railroad, these crossings are provided as means for the private property owners at those locations to go from their land from one side to the other. Basically, they're provided for their convenience. So, besides the issue on the public-private, of course, there is a number of other evidentiary rulings, and although we certainly would request the court to grant judgment NOB, I want to discuss the alternative basis for a new trial. So, of course, on the alternative basis for the new trial, we would also ask the court, if it was to be retried, to follow these, disregard these regulations, not allow the introduction of these regulations that have absolutely no application to the private crossing that we're involved in here, but furthermore, and it's interesting because I just heard the argument before about DUI arrests and charges. In this case, we have the situation that following this accident, James Webb was killed immediately at the time, but there was, as the coroner does, a blood alcohol test, and that indicated in the blood alcohol test that he was beyond the legal presumption. James Webb was the passenger. He was the passenger, that's right. Guy Webb, who was the driver, had, and I can't pronounce this, I'll use the street name, it's called ecstasy. Now, this is what's interesting, is that the plaintiff in this case chose to call, as one of their witnesses, Dr. Politis, who was the emergency room physician who saw Guy Webb at Barnes-Jewish Hospital immediately following this accident. They did testing, and that's where they found this ecstasy in Guy Webb's system. And so on cross-examination, after the plaintiff did their direct examination, I asked the doctor, I says, about the test, and he says, in his opinion, that that showed that he was under the influence of that at the time of this incident. But we didn't end it there. We also hired Christopher Long, an expert witness who is a toxicologist and has been involved in this, and, in fact, I've seen numerous cases from this district itself that have dealt with testimonies given in other cases. What he does, he not only takes the analysis of the ecstasy and the testimony of Dr. Politis, but he also says, I looked at the video, and what the video shows is behavior that is not behavior that's consistent with a sober driver. And, of course, all we have to do for the purposes of submitting evidence is to show that there is some type of impairment. And as I indicated in my recitation of the initial facts, what the video uncontradictorily shows is that not only does he go through the stop sign and then stop with his wheels on the first rail, then briefly rolls back, but then accelerates again and stops again. And Dr. Long says that confirms, in his opinion, why this ecstasy was affecting him and impaired him in his ability to safely operate that wheel. So, in the event that you were to send this back for a new trial, that would certainly be one of the issues that you would need to address so that this error is not caused again. You'll have some rebuttals. Okay. Thank you. May it please the Court. My name is Chris Petrie with the law firm of Byron Carlson, Petrie & Cowell, and we represent the plaintiff, Guy Webb. Also present at the counsel table is Eric Carlson, who is trial counsel in this matter. I'll spare the Court a lengthy statement of facts. As counsel has already referred to, the Court has the videos and the pictures, and I can't do better than that. But I would like to highlight just a few facts about the crossing and the collision before I reach the issues I want to deal with. Do you agree that it's a private crossing? I do agree that it's a private crossing, yes. Okay. Thank you. In this case, the driver only has 128 feet of unobstructed view down the tracks for 15 feet off the ramp. Thus, the sight lines of this crossing were essentially blind to both the driver and the train engineer. And that 128 feet of unobstructed view is 91.1% deficient when compared to AASHTO. I'll say that again? That sight line that he has, only 128 feet of unobstructed view, is over 90% deficient when compared to AASHTO. AASHTO requires the driver to have about 1,000 feet of unobstructed view down the tracks. Secondly, the crossing was unusually hazardous due to its grade. Generally, crossings are on level ground. But in this case, there was an over 40-inch rise in the 30 feet leading up to the rail. Again, compared to AASHTO, that's over 1,000% more slope than AASHTO would require. And is the railroad legally required to maintain the grade? Yes, the railroad is legally required to use reasonable care to make the crossing safe for people who are crossing the crossing. And that's the Kimmons case from Missouri. That's the Dickerson case from Missouri. They're all cited in my brief. The railroad is under a duty to use reasonable care. And that applies to private crossings? Yes, absolutely. Absolutely. The railroad has a duty of reasonable care at private crossings to make the crossing safe and to keep a proper lookout. Finally, as you already talked about, Your Honor, the crossing was composed of gravel, which is a slippery substance. It makes it hard for cars to accelerate and stop. And again, I would point you to the video there. You can see when the webs are trying to take evasive action, their tires are spinning on the gravel. Finally, it's undisputed that the train engineer in this case did not blow the whistle until four seconds after the car became visible from the windsheet. So four seconds elapsed after that car became visible before the train engineer blew his whistle. That's clear evidence that there was not a proper lookout being kept. Now, before I raise the issues on appeal, I just want to talk about the standard of review. The defendant in this case is taking the position that these evidentiary decisions that the judge made get a de novo standard of review. That's plainly wrong. They are citing the Nolan case, which is an asbestos case, where the Supreme Court overruled a special rule of causation that applied only in asbestos cases, and that special rule of causation was the only basis on which the evidence was excluded at trial. And so the Supreme Court said, since we're overturning the only basis, and it's a legal basis for the evidence to be excluded, this is a de novo standard of review. But this is nothing like this case. Extrapolating that asbestos case to this case is plainly wrong for at least two different reasons. One is the judge's decision in this case was not based solely on a legal determination about meeting these regulations and standards. It was based on the admissions the defendant made at trial. Their own evidence was relevant to the judge's decision. In addition, there's case law that's cited in my brief that says that even inapplicable standards may be admitted into evidence because they show what the defendant has knowledge of, they show what's feasible, and they show what's safe. And to put this more kind of philosophically, what the defendant is doing is confusing the decision, the legal determination of duty versus the abuse of discretion decision of the admission or exclusion of evidence probative of that duty. In this case, the jury instruction said nothing, nothing about those regulations. The jury got instructed pursuant to MAI that the railroad had a duty of reasonable care, and it got the ordinary negligence instruction that's submitted in Missouri. The jury was not instructed at all about these regulations or standards. And so the judge made the legal determination, which cannot be seriously disputed, that the railroad had a duty of reasonable care. He then admitted evidence and excluded evidence as he deemed proper probative of that duty of reasonable care. That decision gets an abuse of discretion standard, and that is the standard review on appeal today. And, in fact, the Doyle case, which is cited in my brief, point blank says the admission and exclusion of standards or regulations is a discretionary fall for the trial judge. And, of course, because this is an abuse of discretion standard, the trial judge can only be reversed if his decision was arbitrary, fanciful, or no reasonable person could take that position. Now I'd like to reach the issues on appeal having stated the proper standard review. In this case, the first issue on appeal is did the trial court properly exclude evidence of the distinction between public and private crossings? And I submit to you that it did for several reasons. First, there's the Davis case, the Doyle case, the Bergerson case, and the Darling case. All of those cases are cited in my brief and discussed in my brief. And they, and in particular Davis and Doyle and Darling, they hold that an inapplicable standard is still properly admitted into evidence because it shows what is feasible, what the defendant has knowledge of, and what's safe. In those cases, was the actual standard admitted into evidence, though? Into evidence, yes, into evidence. And that didn't happen here, though? In this case, yes. I mean, they didn't. They weren't allowed to show the jury the regulation, were they? I misunderstood your question. In those cases, at least in the Davis case and the Doyle case, as I understand it, an expert presented the standard. So they were able to look at the standard the expert was testifying, or at least be cross-examined on it? I actually don't know for sure whether that was the case. Well, in Darling they were, weren't they? I believe in Darling they were. But that gets really to my next point, Your Honor. And that is that the defendant is further complaining about the exclusion of the distinction between public and private process and the exclusion of the fact that some of the standards and regulations say the word public. And I submit to you the trial court acted properly there for at least two reasons. One is what we've already talked about, Davis, Doyle, and Burger King. Those cases say that inapplicable standards have meaning. They have legal meaning. They show what's feasible, what's safe. Maybe they don't disagree with you on that. Okay. But how do you prevent the expert from being cross-examined with the regulation that he's relying on? How do you prevent that? It's really two reasons for that. The first is related to this reason I'm talking about. The trial judge did not want there to be jury confusion. He did not want the jury to simply say, well, that has absolutely no meaning whatsoever. When the case law says that it has this meaning. Doesn't that go to the way to the expert's testimony that he's basing his opinion on a regulation that's designed to go to a public process? I think that it goes to exclusion. But certainly it's an abuse of discretion standard. So those kinds of calls are within the trial judge's discretion. But I want to reach the second point, which is my most important point on this point. And it is a point that the defendant did not reply to in its reply brief. And it did not even state anything about it at oral argument today. The defendant's own witnesses testified that they put safety number one, that they always took the safe course. And that they should do everything reasonably possible to make all their crossings public or private safe. Everything reasonably possible. They admitted that standard of care. By admitting that standard of care, they made the distinction. They themselves made the distinction between public and private crossings irrelevant. And that's because if the defendant, by his own admissions, admits that it should do everything reasonably possible for safety at all its crossings, then the fact that these standards refer to public crossings is irrelevant. Because regardless of whether it's a public or private crossing, the conduct called for in the standard and the regulation is reasonably possible. Can the defendants stand here today and seriously dispute that it wasn't reasonably possible to cut the vegetation at this crossing? Can the defendants sit here today and say that it wasn't reasonably possible to blow the whistle earlier? Can the defendants sit here today and say it wasn't reasonably possible to have the slope of the crossing changed? Their own admission made that distinction irrelevant, Your Honor. But you're saying there should have been a direct verdict at the close of the plaintiff's case? Well, what I'm saying, Your Honor, is that the defendant can admit its own standard of care, and that's the Jablonski case, and that's cited in my brief. And these defendants admitted their own standard of care. I also want to point out that, and this is crucial, it's from the Darling case. The jury was never instructed, never instructed that these regulations conclusively establish the standard of care or determine the standard of care. And the Darling case says that's critical in a case when a party is complaining about the admission or exclusion of a standard. And I'd like to return back to the abuse of discretion standard of review. In this case, as we know, abuse of discretion requires the trial judge to act arbitrarily or fancifully. He was acting with reason. He was acting with the reason of the defendant's admissions and the case law that I've described above. Even if you would have taken a different course, his conduct was not arbitrary or fanciful. And my last point on this point is harmless error. The evidence regarding the danger of this crossing was truly overwhelming. I've already covered quite a bit of it. The slope of the crossing was over 1,000 percent greater than AASHTO. The sightline of the crossing gave less than 10 percent of the sightline required by AASHTO. Are people who cross at private crossings really only entitled to less than 10 percent of the safety level at public crossings? Are they really to get 1,000 percent more danger in terms of the slope of the crossing at a crossing? This evidence showed— Do we know why the jury ruled in your favor? I believe— We know they picked one of your elements of negligence. Correct. No, there are no special parameters. I believe the jury ruled in our favor because we demonstrated that the defendants did not use reasonable care at the crossing. That's the way cases get submitted in Missouri, and I am— If there is evidence to support one of your allegations of negligence in the record, the fact that there was evidentiary errors, could your judgment still be affirmed? Yes. Yes. I also want to point out that Missouri is a peer-to-peer fault state, so the fact that this was a 50-50 verdict would make no difference in Missouri. One more percent of fault to the plaintiff would not have materially changed the verdict in this case. I did look at your jury instructions yet. I apologize, but did you use Missouri instructions? Yes.  The parties agreed that Missouri's substantive law applied because the accident took place in Missouri. But they're quite abbreviated. I'm sorry? Missouri's instructions are very abbreviated. There's no question about that. No question about Missouri jury instructions. The second issue on appeal today, Your Honors, is the trial court properly excluded evidence of alleged intoxication from a urine test. Before I get to the case on that, I just want to make a critical opening point. The defendant's own expert in this case, Dr. Long, admitted that, first of all, there's no evidence of alleged drug use other than the urine test. And Dr. Long, their expert, admitted that a urine test cannot show the concentration of the drug in a system, and therefore it cannot show the amount of the drug taken. It can't reliably detect when the drug was taken. It can be taken up to four days before the test. And, most importantly, a urine test cannot be scientifically linked to intoxication. The defendant's expert made all those admissions. In addition, the case law says that. The Zarak case, cited by the defendant himself, says, We find that these cases, talking about blood alcohol cases, are distinguishable in that they involve alcohol rather than marijuana. The testing for these two substances is simply different. Respondent points that nothing to suggest that the same inferences should flow in the presence of alcohol in the blood and the presence of marijuana metabolites in the urine. That's the Zarak case. So the evidence, the alleged evidence of use here is something that is not ordained by the inmate courts. Moreover, even if you can get past the non-probative evidence of use, there's no common evidence of intoxication in this case. Dr. Long admitted he had no scientific or medical testing basis to detect intoxication. Instead, he just wanted to look at a video and say, Well, I can see by the way the car's driving, that guy's intoxicated. That type of evidence, that type of theory for proving intoxication has never, never been blessed or held to be legal by the Illinois courts. Did you have an expert testify with regards to how to interpret his conduct? We had an expert, a human factors expert, who did not talk about impairment at all. Did not talk about intoxication or impairment at all. Was he allowed to be cross-examined with regards to that? Intoxication or impairment? Yeah. No, but he didn't testify as to it either. What did he testify to then? He testified about the standards and about the accident, about the fact that the railroad wasn't using reasonable care. Okay. Now, the railroad attempts to squeeze their case into the parameters of the Alcord Marine case. And I'll grant you, in Alcord Marine, the court did say that reckless and inexplicable behavior that shows gross disregard for another's safety, in Dick Russell's case, could be confident evidence of intoxication. However, this case is nothing like Alcord Marine. Again, I ask you to watch the video. The webs were trying to take, I'm sorry, in Alcord Marine, let me lay the facts real quick. There's a boat driver who's admitted to drinking alcohol before driving the boat. He drives straight at a fallen water steer. The court says purposely straight at a fallen water steer. And at the last second, turns his boat and cuts the water steer severely. The court found that that was grossly reckless and inexplicable behavior and could be evidence of intoxication. But this case is nothing like that. And again, I'd ask you to look at the video. The webs are trying to take evasive action, and their tires are spinning on the gravel. To make this case like Alcord Marine, the webs would have had to turn their car and drive directly at the train. Finally, even if you could get past the non-provative use, alleged evidence of abuse, and the non-provative evidence of intoxication, and allow someone to testify about intoxication from watching the video, I don't think Dr. Wong is that person. He admitted he's not qualified as an accident reconstructionist. He's reviewed no articles or scientific studies that address how a person is supposed to react to a train approaching a car. He's never witnessed a train crossing collision. He's never seen a video before of a train crossing collision. He has no training in human factors technology. And he's not, most importantly, he's not familiar with complex reaction times or the amount of time it takes a person to act when faced with this level of stimulants in an emergency like this. Even if you could get past all of that, there's still the cumulative effect of this. The alleged evidence of abuse is non-provative because it comes from a urine test. And we've already talked about all the problems with the urine test. Can't detect concentration. Can't detect amount. Can't detect any specificity when the drug is taken. Can't link intoxication to a urine test. In addition, the evidence of intoxication is non-provative because it doesn't come from medical testing or scientific testing like blood alcohol level. It doesn't come from the plaintiff's own admissions. And it doesn't come from an eyewitness to the plaintiff's behavior. So those two points are non-provative. But the prejudice would have been higher. I've pointed in my brief to cases saying that alcohol, the consumption of alcohol, without concomitant evidence of intoxication is highly prejudicial. That prejudice would increase in the case of alleged drug use. Again, I do want to point to the standard review on this point. It's an abuse of discretion. The trial court has to act fancifully or arbitrarily in order for it to be an abuse of discretion. In this case, the trial court acted with reason. It acted with the admissions of Dr. Long in the case law in my brief and the case law that I've discussed here. The remaining issues on appeal do not require substantial instruction. The court properly instructed the jury. The court gave jury instructions, gave the MAI jury instructions on substantive issues. That's what it's required to do under Missouri law. The defendant is arguing that the contributory negligence instruction wasn't specific enough as to Guy Webb. As you already pointed out, Your Honor, Missouri-approved jury instructions are very short. There's no question about it. They are not very specific. And the instruction said you can find Guy Webb, contributory negligence, if you find that he failed to keep a proper lookout. That fairly smoothed the issue for the jury. Finally, even if you did think there was some error in the jury instructions, the defendant's firm is not only to object but to proffer a proper instruction. In this case, the defendant did not proffer proper instructions. All of the instructions that it submitted, particularly this contributory negligence one that it's complaining about, all included the term proximate cause, the actual language, proximate cause. Missouri law and MAI are clear that the issue of proximate cause is not to be submitted on the terminology of proximate cause. Instead, it's to be submitted on directly contributed to cause, or directly caused or directly contributed to cause. None of their jury instructions contained the proper language for causation in Missouri. So they offered no proper instructions, and the trial court was correct in overruling their objections. They also complain about the trial court's overruling through 13 objections. I don't think it's a good use of my time. It appears that I don't have time to go through this line by line. But I can tell you if you look at my brief, I thoroughly demonstrated to you that all of the complained about opinions were either expressly disclosed in a deposition or in an expert report. Or at the very least, the complained of opinions are merely an elaboration upon a properly disclosed opinion, a more precise statement of an original opinion, a logical corollary to a disclosed opinion, or an opinion that was worded differently but was the same in substance as a disclosed opinion. The case law, the Bachman case, the Barton case, the Johnson case, all cited in my brief, all say that those categories are proper admissions to testimony. The trial court acted properly there and certainly didn't abuse its discretion. Point five, Trooper Renshaw's testimony was properly excluded. The case law here says that in the trial court's discretion, a trooper or an officer may give speculative testimony, like expert testimony, regarding causation. But it's in the trial court's discretion, and it can only happen if the officer is sufficiently experienced and he has sufficient qualifications. Trooper Renshaw. The remaining points on POI, I stand on my brief, Your Honor. We have two. Thank you. Rebuttal. I don't believe I'll be able to respond to all of that, but I will do my best in my short time. First of all, counsel kept referring to these AASHTO standards and MUTCD. If you look at our brief, AASHTO standards, and AASHTO is an organization of public highway traffic safety engineers. In order to be a member of AASHTO, you have to be working for a public agency as an engineering officer. AASHTO is for the purposes of designing public highways. And their expert, again, just like they did on referring to these other regulations, their expert kept talking about these AASHTO standards, but these AASHTO standards did not apply to a private railroad rate crossing. And they also referred to, his expert also referred to MUTCD standards. And MUTCD is more than just a standard. It's actually, the MUTCD is the Manual of Uniform Traffic Control Devices. That's the acronym of the three. And that is actually put together by engineers and is adopted virtually verbatim by every state. Now some states don't adopt all the provisions of that, but the state of Missouri, in this case, has adopted substantially the MUTCD. And as was demonstrated in our brief and in the evidence at trial, the MUTCD specifically says it does not apply to private railroad rate crossings. The MUTCD applies to public crossings, public roadways. So again, they kept, they keep referring to standards that they don't want explained, and they don't want the jury to understand that those standards apply to public railroad rate crossings and public roadways, not to private crossings such as what we have in this case. And so everything he talked about, these obstructed sight lines and all of that, that comes out of Nashville for public crossings. And of course, public roadways where people are traveling at high speeds and approaching a railroad rate crossing. So these standards obviously are different for that as opposed to this private crossing that's involved in this case. And that's why those standards, again, should not have been invented and allowed the experts to refer to those standards as a basis for criticizing the Union Pacific Railroad. The plaintiff makes the reference to the railroad somehow creating a legal duty for themselves that's beyond the legal duty required by the state of Missouri because they said that they want to do safety first. That does not create some new legal duty because a witness testified that they want to do things safely. That doesn't create some new legal duty, which is apparently what the plaintiff is trying to argue here. And I apologize, but really this argument is nonsense where the plaintiff says the jury would be confused if they were told that these standards apply to public crossings. The jury is confused by them not being told that these don't apply to private railroad rate crossings. The cases the plaintiff cited, and I won't be able to go through each one of them, but the plaintiff's cases that he cited on this proposition dealt with, one case was a product liability case involving a ladder that when it was manufactured, complied with the regulations. But at the time that it was sold and at the time of the accident, it did violate the standards. And that's the reason it was allowed into evidence, but again the standard was allowed into evidence. The jury understood it in that case. The other case that he cited involved the filling of some gas tanks. And it pertained to standards that were years ago when this tank was developed, but the standards had changed in the meantime. And again, it dealt with standards that were in effect at the time of the accident, even though at the time the tank was built, it did not apply. But again, the jury was told that those were the standards and the jury could make an intelligent decision as to whether or not those standards should have been applied to that case. Defending this case was not allowed to do this. Thank you. Thank you. Let me take an advisement. It would be a decision in due time.